1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KATHRYN THAUT, et al.,                    No. 2:15-cv-0590-JAM-KJN (PS)

12              Plaintiffs,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   K. HSIEH, et al.,

15              Defendants.

16

17        Presently before the court are four motions to dismiss plaintiffs' first amended complaint,

18   the first filed by the prison physician defendants Dr. K. Hsieh, Dr. John Lipson, Dr. Samuel

19   McAlpine, Dr. Jack McCue, and Dr. G. Jude Shadday (collectively "State defendants") (ECF No.

20   48), the second and third filed by Dr. Michael Bunuan and Northbay Healthcare d.b.a. Vacavalley

21   Hospital ("Vacavalley") (ECF Nos. 46, 49), and the fourth filed by Dr. Ramesh Dharawat (ECF

22   No. 45).  Plaintiffs filed oppositions to all four motions and the moving defendants all filed

23   replies.  (ECF Nos. 51, 52, 53, 54, 56, 57, 58, 60.)  The court has fully considered the parties'

24   briefs and appropriate portions of the record.[1]  For the reasons that follow, the court recommends

25   that defendants' motions to dismiss be granted and this action be dismissed with prejudice.

26   ////

27   _____

28   [1] These motions were submitted on the record and briefs without oral argument pursuant to Local
     Rule 230(g).  (ECF No. 62.)

I.      Relevant Allegations of the First Amended Complaint

The background facts are taken from plaintiffs' operative first amended complaint.  (See ECF No. 43 ("FAC").)  Plaintiffs are the wife and children of decedent David Edwards ("decedent"), an inmate at California State Prison, Solano ("CSP Solano"), who died on March 21, 2013, due to "[c]ardiopulmonary arrest secondary to sudden death from critical aortic stenosis."  Generally stated, plaintiffs allege that defendants, all of whom were involved in decedent's health care at various points between March 2010 and his death on March 21, 2013, acted with deliberate indifference to the serious medical need arising from decedent's aortic stenosis resulting in decedent suffering pain and, ultimately, death.  (Id. ¶¶ 1-5, 16, 19, 100, 244-49.)  Plaintiffs allege that they are all heirs to decedent's estate.  (Id. ¶¶ 1-5.)  Plaintiffs attach to their first amended complaint well over one hundred pages of medical records relating to the medical care defendants provided to decedent between March 2010 and his death in March 2013, in addition to numerous documents regarding decedent's alleged medical condition more generally.  (Id., Exhibits 1-30.)

With regard to defendants Dr. Hsieh, Dr. McAlpine, Dr. McCue, Dr. Shadday, and Dr. Lipson, plaintiffs allege that they were licensed medical practitioners who, in assorted capacities, acted as decedent's primary and supervisory caregivers at CSP Solano and provided medical care to decedent between September 2010 and his death on March 21, 2013.  (Id. ¶¶ 6-10, 162, 166.)  Plaintiffs allege that defendant Dr. Dharawat was a medical health professional who worked at San Joaquin General Hospital ("SJGH") and oversaw and directed decedent's medical care on the occasions he was there.  (Id. ¶¶ 12, 47, 95-96, 98.)  Plaintiffs allege that defendant Vacavalley was a "medical professional facility practicing under the authority of the State of California" in Solano County and that decedent had been admitted there for outpatient care on a couple of occasions between March 2010 and the date of his death.  (Id. ¶¶ 15, 20, 94.)  Plaintiffs allege that defendant Dr. Bunuan was a medical healthcare professional who treated decedent during his time at Vacavalley in March 2013.  (Id. ¶¶ 13, 91-94.)  Plaintiffs' specific factual allegations are set forth below in chronological order.

////

2

Plaintiffs allege that on March 23, 2010, decedent was taken to defendant Vacavalley after suffering a stroke.  (Id. ¶ 20.)  That same day, a 2-D echocardiogram was performed on decedent at Vacavalley by Dr. Dassah.  (Id. ¶ 21, Exhibit 1 at 1.)  Based on the results of that echocardiogram, Dr. Dassah noted that decedent had "heavy sclerosis of the aortic leaflets" and "moderate aortic stenosis."  (Id. ¶¶ 22, 24, Exhibit 1 at 1.)  Decedent was discharged from Vacavalley on March 25, 2010, with a discharge summary noting that decedent had fully recovered from his stroke and "did not have a specific atrial fibrillation," but that a "cardiac followup for his coronary disease" was recommended.  (Id. ¶¶ 26, 27, Exhibit 1 at 4, 8.)

On April 29, 2010, Dr. Dassah recommended that decedent undergo an electrocardiogram, nuclear imaging, and Holter monitor examinations.  (Id. ¶ 28, Exhibit 2 at 1.)  An echocardiogram was performed on decedent on May 12, 2010, resulting in a finding that decedent's aortic valve was sclerotic.  (Id. ¶ 29, Exhibit 2 at 3.)  On June 6, 2010, Dr. Dassah recommended that decedent have a cardiac catheterization performed.  (Id. ¶ 30, Exhibit 2 at 4.)  Dr. Dassah next examined decedent on June 30, 2010, noting that decedent had "decreased breath sounds at the bases," known coronary artery disease status post coronary bypass surgery, and "atrial fibrillation on Warfarin."  (Id. ¶¶ 32, 35, 36, Exhibit 2 at 5-6.)  Dr. Dassah also scheduled decedent for a cardiac catheterization and advised decedent to continue with his current medications.  (Id.)

On September 1, 2010, defendant Dr. Shadday interviewed decedent regarding decedent's complaint that he experienced shortness of breath and dizziness while walking the yard at CSP Solano.  (Id., Exhibit 3 at 3-4.)  Dr. Shadday stated in his progress note for that interview that decedent had a history of coronary artery disease, atrial fibrillation, aortic stenosis, coronary artery bypass graft, and gastrointestinal bleed.  (Id., Exhibit 3 at 4.)  Dr. Shadday also indicated a belief that decedent's shortness of breath was "due to cardiac etiology or pulmonary" and noted that an angiogram was pending.  (Id.)  Dr. Shadday ordered an x-ray of decedent's chest, which occurred later that day and showed a mildly enlarged heart, pulmonary vasculature within normal limits, and clear lungs.  (Id., Exhibit 3 at 4-5.)

////

////

3

On September 9, 2010, Dr. Dassah conducted another medical consultation with decedent and noted that a "[c]ardiac catheterization recommendation was made to [decedent's] primary care physician, Dr. Shadday," but that such recommendation had not yet been approved.  (Id. ¶ 46, Exhibit 2 at 18-19.)  Dr. Dassah noted further that he had "talked with Dr. Shadday about this case, indicating [decedent's] condition at this time was recurrent chest discomfort and shortness of breath with walking."  (Id.)  He also noted that the results of decedent's physical examination were "suggestive of aortic stenosis."  (Id.)  Finally, among other things, Dr. Dassah recommended that decedent's primary physician "reevaluate [decedent's] need for cardiac catheterization on an as-soon-as-possible basis" and that decedent be seen once more in four weeks for another assessment.  (Id.)  Later on September 9, 2010, Dr. Shadday saw decedent and noted decedent's claim that he had suffered prolonged shortness of breath over the prior few weeks and had difficulty walking more than 50 yards.  (Id. ¶ 45, Exhibit 3 at 6-7.)  Dr. Shadday also "decided to direct admit [decedent] to SJGH for cardiac eval[uation] for [shortness of breath] and cardiac cath[eterization]."  (Id.)

On September 10, 2010, decedent was sent to SJGH, where defendant Dr. Dharawat performed a transthoracic echocardiogram.  (Id. ¶ 47, Exhibit 5 at 1-5.)  Dr. Dharawat's examination notes stated that decedent's aortic valve was "HEAVILY CALCIFIED," but that there was "no aortic valvular vegetation" and that decedent had "[m]oderate valvular aortic stenosis."  (Id. ¶ 47, Exhibit 5 at 1-2.)  Dr. Dharawat also noted that decedent's aortic valve area measured 0.90 cm².  (Id.)  Plaintiffs assert that an aortic valve area of less than 1.0 cm² is considered medically severe and that Dr. Dharawat "deliberately and intentionally" mischaracterized decedent's aortic stenosis as moderate when he should have reported it as being severe under the relevant medical guidelines.  (Id. ¶¶ 48, 149-150.)

Plaintiffs allege further that Dr. Dharawat also did not recommend aortic valve replacement surgery or refer decedent to a cardiothoracic surgeon despite decedent's need for such a course of treatment, instead noting that such a procedure would be recommended if decedent became symptomatic.  (Id. ¶¶ 152-53.)  Plaintiffs also allege that Dr. Dharawat prescribed to decedent a number of medicines that were ineffective at treating decedent's aortic

4

stenosis.  (Id. ¶¶ 157, 159.)  Plaintiffs assert that Dr. Dharawat took these actions in deliberate disregard of the fact that decedent's aortic stenosis posed an "excessive risk of sudden death" if he did not undergo valve replacement surgery.  (Id. ¶ 155.)

A SJGH transfer report dated September 15, 2010, noted decedent's principal diagnoses as "coronary artery disease," "moderate mitral regurgitation," and "moderate aortic stenosis." (Id. ¶¶ 49-50, Exhibit 5 at 3-4.)  The report also noted that "[i]f [decedent] becomes symptomatic, then we can recommend for mitral valve repair and aortic valve replacement."  (Id.)  It noted further that decedent was to "return to the ER if any increase in pain, chest pain, shortness of breath."  (Id.)

On September 17, 2010, Dr. Shadday filled out a health care services physician request form to have a pulmonary function test performed on decedent noting that decedent had been evaluated at SJGH and was "found to have severe CAD with aortic stenosis/mitral regurgitation" and was a "possible candidate for surgery."  (Id. ¶ 51, Exhibit 3 at 8.)  Plaintiffs contend that Dr. Shadday recommended that decedent be examined by a pulmonary specialist instead of a cardiothoracic surgeon in order to delay decedent from receiving valve replacement surgery.  (Id. ¶ 176.)

On September 23, 2010, during a follow-up on a consultation for a pulmonary function test that occurred at Doctors Medical Center, decedent stated that "[t]hey gave me an x-ray and they talked to me.  He said I need surgery."  (Id. ¶ 52, Exhibit 3 at 9.)  The report for this follow-up was signed by a registered nurse and Dr. Shadday.  (Id.)

On October 21, 2010, the results of a follow-up consultation for decedent's shortness of breath at Doctor's Medical Center showed that plaintiff's shortness of breath was "still not explained by pulmonary function test and 6-minute walk testing," that decedent had "[n]o restrictive or obstructive ventilatory impairment," and that decedent's "sheerness of breath could be due to his aortic stenosis, mitral regurgitation."  (Id. ¶ 53, Exhibit 6.)  That report also noted that the "question was last time [decedent was seen at Doctor's Medical Center was decedent's] possible candida[cy] for surgery for aortic stenosis, mitral regurgitation" and that decedent "can go for his cardiac surgery with average risk for pulmonary complications."  (Id. ¶ 54, Exhibit 6.)

On October 28, 2010, defendant Dr. Lipson filled out a medical progress note regarding a follow-up of decedent's outpatient visits for a right cataract extraction and pulmonary function test. (Id. ¶ 56, 57, Exhibit 7 at 1-3.)  In that note, Dr. Lipson stated that he had reviewed decedent's cardiac catheterization report, but did not yet have any records from decedent's pulmonary function test. (Id.)  He noted that decedent denied chest pain or shortness of breath at that time, the cardiac catheterization report showed that decedent's aortic valve area was between 1.1 and 1.2 cm², and the report recommended "medical therapy at this point and then to use a [transesophageal echocardiogram] to make further assessment of [decedent's] valves and need for surgery." (Id.)  Plaintiffs allege that Dr. Lipson purposefully mischaracterized the findings of the September 10, 2010 transthoracic echocardiogram performed at SJGH by noting that decedent had an aortic valve area of 1.1 to 1.2 cm², rather than the 0.90 cm² determined by that procedure. (Id. ¶¶ 57, 177, Exhibit 7 at 1.)  Plaintiffs also allege that Dr. Lipson did not include aortic stenosis on decedent's problem list. (Id. ¶¶ 55, 57.)

Dr. Lipson issued a second medical progress note on November 18, 2010, wherein he noted that decedent was complaining of some chest pain, recommended to decedent that he call "man down" or go to the TTA when he experienced chest pain, and found that decedent had a "[h]istory of atrial fibrillation." (Id. ¶ 58, Exhibit 7 at 4-5.)  Dr. Lipson issued another progress note on December 14, 2010, that stated that decedent had not been taking some of his prescribed medications and that he explained to decedent that if decedent experienced symptoms such as anterior chest pain, "this is consistent with decreased oxygen going to his heart, which puts him at risk of sudden death." (Id. ¶ 62, Exhibit 7 at 6.)  Plaintiffs also allege that while Dr. Lipson noted that he had reviewed decedent's May 2010 echocardiogram results on that date, he did not discuss the September 10, 2010 catheterization examination results, "which diagnosed aortic stenosis." (Id. ¶¶ 63, 180-83.)  Plaintiffs allege further that Dr. Lipson also reviewed decedent's October 21, 2010 pulmonary function test results and noted those results, but not its "recommendation to go for aortic stenosis surgery." (Id. ¶ 64.)

////

////

6

1    On April 8, 2011, defendant Dr. McAlpine, a supervisory physician at CSP Solano,

2  approved a request by Dr. Lipson to order a Holter monitor test for decedent.  (Id.¶¶ 68, 186,

3  Exhibit 9.)  The form Dr. McAlpine signed states decedent's principal diagnoses as "paroxysmal

4  afib" and "dizziness."  (Id.)  Plaintiffs assert that Dr. McAlpine's approval for a Holter monitor

5  test showed that he was aware of decedent's heart symptoms and that the approval was "an

6  intentional deliberate act" by Dr. McAlpine "to evade and deny [decedent] the only treatment of

7  valve replacement surgery."  (Id. ¶ 189.)

8    Dr. Lipson issued one more medical progress note on July 5, 2011, which stated that

9  decedent complained of an irregular pulse and "periodically gets about 2 weeks of a firm, tense,

10  abdomen that is distended."  (Id. ¶ 70, Exhibit 7 at 10-11.)  Plaintiffs also allege that, in this

11  report, Dr. Lipson attributed decedent's March 2010 stroke to paroxysmal atrial fibrillation,

12  which was contrary to the findings of the March 25, 2010 Vacavalley discharge summary.  (Id. ¶

13  71.)  On July 21, 2011, decedent provided Dr. Lipson a health care services form wherein

14  decedent reported that he had an irregular pulse and suffered chest pain when walking.  (Id. ¶ 72.)

15    On September 2, 2011, defendant Dr. Hsieh issued a medical consultation report in

16  response to decedent's request that his chrono be changed to not have any stair restrictions, noting

17  that decedent "admits to getting dizzy and falling off the stairs in the past," but that decedent

18  "denies any chest pain, chest pressure, [shortness of breath], nausea, no vomiting, no chest

19  palpitations."  (Id. ¶¶ 76, Exhibit 11 at 1-3.)  Plaintiffs also allege that, in that report, Dr. Hsieh

20  attributed decedent's March 2010 stroke to atrial fibrillation, which was contrary to the findings

21  of the March 25, 2010 Vacavalley discharge summary.  (Id. ¶ 75, Exhibit 11 at 2.)  Plaintiffs also

22  allege that Dr. Hsieh discussed this matter with defendant Dr. McCue.  (Id. ¶ 76.)

23    On October 19, 2011, defendant Dr. McCue, decedent's "supervisory medical health care

24  practitioner in 2011 and 2012," issued a Chief Medial Executive evaluation of decedent, which

25  noted that decedent was unwilling to take his prescribed medications despite multiple medical

26  problems, but which plaintiffs allege also did not acknowledge decedent's "ongoing symptoms of

27  chest pain, shortness of breath or irregular heartbeat."  (Id. ¶¶ 77, 191, Exhibit 10 at 2.)  In a list

28  of decedent's chronic problems attached to Dr. McCue's evaluation, Dr. McCue wrote "aortic

1   stenosis," but scratched out the word stenosis, wrote "sclerosis" in its place, and annotated "0

2   stenosis" under the cross-out.  (Id. ¶¶ 78, Exhibit 10 at 3.)

3        On December 2, 2011, Dr. Hsieh conducted a consultative examination of decedent.  (Id.

4   ¶ 80, Exhibit 11 at 5-11.)  In his notes for that examination, Dr. Hsieh stated that decedent denied

5   experiencing shortness of breath despite also issuing a primary care providers progress note that

6   same day with a box checked off indicating that decedent complained of shortness of breath.  (Id.)

7   Dr. Hsieh provided nearly identical reports on the following dates:  February 2, 2012; March 29,

8   2012; May 21, 2012; June 22, 2012; October 1, 2012; and December 28, 2012.  (Id. ¶¶ 81-82, 85-

9   88, Exhibit 11 at 9-31.)  Plaintiffs allege that Dr. Hsieh "deliberately, recklessly and with malice

10  lied on his medical consultation records that [decedent] never complained of chest pains or

11  shortness of breath."  (Id. ¶ 198.)  Plaintiffs also allege that Dr. Hsieh did not perform a physical

12  examination of decedent or take efforts to determine the condition of his heart during any of these

13  consultative examinations.  (Id. ¶¶ 89, 202-03.)

14       On April 17, 2012, Dr. McCue held a high risk clinic consultation with decedent, which

15  had been authorized by Dr. McAlpine and requested by Dr. Hsieh.  (Id. ¶¶ 83-84, Exhibit 10 at 2,

16  4.)  During this consultation, Dr. McCue noted that decedent refused to take his medication

17  regimen and that he told decedent that "it is a stupid decision and you are allowed to be stupid."

18  (Id.)  Dr. McCue also noted that the only medication he cared about having decedent take was his

19  prescribed statin.  (Id.)

20       On March 10, 2013, decedent suffered from a syncopal episode while in the shower at

21  CSP Solano, rendering him unconscious for several minutes.  (Id. ¶ 90, Exhibit 12 at 1-4.)

22  Decedent was subsequently taken by ambulance to defendant Vacavalley.  (Id.)  Defendant Dr.

23  Bunuan conducted a 2-D echocardiogram on decedent at Vacavalley on March 11, 2013.  (Id. ¶

24  91, Exhibit 13 at 2.)  The results of this test showed that decedent had an aortic valve area

25  measuring 0.53 cm².  (Id.)  Based on these results, Dr. Bunuan determined that decedent had

26  "severe" aortic stenosis and that that condition may have been the cause of decedent's syncopal

27  episode.  (Id. ¶ 92, Exhibit 13 at 2.)  Dr. Bunuan also expressed concern that decedent "may need

28  [a] cardiac evaluation for possible surgery."  (Id.)  Plaintiffs allege, however, that "Vacavalley

and Dr. Bunuan were not capable of evaluating or treating [decedent's] symptomatic critical aortic stenosis." (Id. ¶ 217.) Plaintiffs also allege that Dr. Bunuan and Vacavalley graded decedent's aortic stenosis as "severe," when it should have been graded as "very severe" or "critical," so they could "purposefully transfer [decedent] to another hospital incapable of evaluating symptomatic critical aortic stenosis." (Id. ¶ 215.)

That same day, decedent was transferred from Vacavalley to SJGH for further management. (Id. ¶¶ 93-94.) The transfer summary issued by Dr. Bunuan "recommended a cardiology evaluation to see if aortic replacement is required," and noted that Dr. Bunuan had talked with a hospitalist at the receiving hospital. (Id. ¶¶ 93-94, Exhibit 13 at 1.) Decedent's condition was deemed "stable" at the time he was discharged from Vacavalley. (Id. ¶ 94, Exhibit 13 at 7.) Plaintiffs allege that Vacavalley and Dr. Bunuan "transferred [decedent] because of a deliberate policy, custom, and practice for CSP Solano prisoners and not for [decedent's] specific medical need." (Id. ¶ 219.) Plaintiffs allege further that "[d]efendants would never transfer a private citizen or non-prisoner to SJGH for evaluation of aortic valve surgery" because that facility was "incapable of evaluating or treating" such a condition. (Id. ¶¶ 218-19.) They also allege that Vacavalley and Dr. Bunuan knew that SJGH "was incapable of evaluating or treating [decedent's] life threatening medical need." (Id. ¶ 218.)

Later on March 11, 2013, decedent was admitted to SJGH by Dr. Nand, who reviewed decedent's history and conducted a physical, finding, among other things, that decedent's syncopal episode was "likely secondary to severe aortic stenosis." (Id. ¶ 95, Exhibit 14 at 1-3.) Dr. Nand also noted that he had reviewed the September 2010 SJGH cardiology report that "showed aortic calcified stenosis." (Id.)

On March 12, 2013, Dr. Dharawat provided a consultative examination of decedent noting that decedent had a "known history of multiple cardiac risk factors along with aortic root stenosis on medical management with syncopal episode." (Id. ¶ 96, Exhibit 5 at 7-8.) He also noted that decedent's 2-D echocardiogram results showed that decedent had "severe aortic stenosis at 0.7 cm squared valve area." (Id. ¶¶ 96-97, Exhibit 5 at 7-8.) Dr. Dharawat also noted that decedent was to be kept at SJGH overnight so he could undergo a cardiac catheterization the next morning.

1  (Id.)  A transthoracic echo cardiogram performed that same day indicated that decedent had an

2  aortic valve area of 0.50 cm².  (Id. ¶ 98, Exhibit 5 at 11-12.)  Plaintiffs allege that Dr. Dharawat

3  purposefully changed the valve area results in his report "in order to grade [decedent's valve area]

4  as 'severe' instead of 'critical' and conduct a meaningless and completely unnecessary

5  catheterization of [decedent] the next day."  (Id. ¶ 228.)

6      On March 13, 2010, Dr. Dharawat performed an operation on decedent that included a left

7  heart catheterization, which plaintiffs allege was unnecessary under established medical standards

8  and further delayed him from being transferred to a facility that could provide aortic valve

9  replacement surgery.  (Id. ¶¶ 98, 230, Exhibit 5 at 9-10.)  In his summary of findings and

10  recommendation resulting from that procedure, Dr. Dharawat noted that decedent had "moderate

11  mitral regurgitation and severe aortic stenosis" and recommended "aortic valve replacement

12  surgery, probably mitral valve repair or annuloplasty, and possibly diagonal and right coronary

13  artery bypass surgery."  (Id.)

14      On March 16, 2013, Dr. Sorour examined decedent at SJGH and noted that he was not in

15  any acute distress, but that "[h]e started having abdominal distension with decreased bowel

16  sounds and emesis on March 13."  (Id. ¶ 99, Exhibit 15.)

17      On March 21, 2013, decedent died at SJGH.  (Id. ¶¶ 100-103, Exhibit 14 at 4-5.)  That

18  same day, Dr. Nand issued a death summary stating that the cause of death was "cardiopulmonary

19  arrest secondary to sudden death from critical aortic stenosis."  (Id. ¶ 100, Exhibit14 at 4.)  The

20  death summary also noted that decedent had been transferred to SJGH by Vacavalley "for further

21  workup and to be transferred later to a tertiary care center for surgical intervention as needed."

22  (Id. ¶ 101, Exhibit 14 at 4.)  It noted further that decedent "was recommended to be evaluated by

23  [a] Cardiothoracic surgeon at a tertiary care center as our facility is not able to perform such an

24  intervention."  (Id.)  The report also stated that decedent could not be transferred to a tertiary care

25  facility due to him having a bowel obstruction and "could not have valvular surgery because of

26  his obstruction."  (Id. ¶¶ 103-104, Exhibit 14 at 4-5.)

27  ////

28  ////

1    Based on the above allegations, plaintiffs assert the following causes of action.  First, they

2    claim that defendants Dr. Hsieh, Dr. McAlpine, Dr. McCue, Dr. Shadday, Dr. Lipson, and Dr.

3    Dharawat violated decedent's Eighth Amendment rights by acting with deliberate indifference to

4    the serious medical need presented by decedent's aortic stenosis between September 10, 2010,

5    and decedent's syncopal episode on March 10, 2013, which resulted in decedent experiencing

6    pain, suffering, and mental and emotional anguish in the years prior to his death.  (Id. ¶ 245.)

7    Second, they claim that all defendants remaining in this action acted with deliberate indifference

8    with regard to that same condition, resulting in decedent's death.  (Id. ¶¶ 247-49.)

9    II.    Legal Standards

10         A.    *Motion to Dismiss*

11    A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6)

12    challenges the sufficiency of the pleadings set forth in the complaint.  Vega v. JPMorgan Chase

13    Bank, N.A., 654 F. Supp. 2d 1104, 1109 (E.D. Cal. 2009).  Under the "notice pleading" standard

14    of the Federal Rules of Civil Procedure, a plaintiff's complaint must provide, in part, a "short and

15    plain statement" of plaintiff's claims showing entitlement to relief.  Fed. R. Civ. P. 8(a)(2); see

16    also Paulsen v. CNF, Inc., 559 F.3d 1061, 1071 (9th Cir. 2009).  "To survive a motion to dismiss,

17    a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

18    is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v.

19    Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads

20    factual content that allows the court to draw the reasonable inference that the defendant is liable

21    for the misconduct alleged."  Id.

22    In considering a motion to dismiss for failure to state a claim, the court accepts all of the

23    facts alleged in the complaint as true and construes them in the light most favorable to the

24    plaintiff.  Corrie v. Caterpillar, Inc., 503 F.3d 974, 977 (9th Cir. 2007).  The court is "not,

25    however, required to accept as true conclusory allegations that are contradicted by documents

26    referred to in the complaint, and [the court does] not necessarily assume the truth of legal

27    conclusions merely because they are cast in the form of factual allegations."  Paulsen, 559 F.3d at

28    1071.  The court must construe a pro se pleading liberally to determine if it states a claim and,

1    prior to dismissal, tell a plaintiff of deficiencies in his complaint and give plaintiff an opportunity

2    to cure them if it appears at all possible that the plaintiff can correct the defect.  See Lopez v.

3    Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc); accord Balistreri v. Pacifica Police

4    Dep't, 901 F.2d 696, 699 (9th Cir. 1990) (stating that "pro se pleadings are liberally construed,

5    particularly where civil rights claims are involved"); see also Hebbe v. Pliler, 627 F.3d 338, 342

6    & n.7 (9th Cir. 2010) (stating that courts continue to construe pro se filings liberally even when

7    evaluating them under the standard announced in Iqbal).

8         In ruling on a motion to dismiss filed pursuant to Rule 12(b)(6), the court "may generally

9    consider only allegations contained in the pleadings, exhibits attached to the complaint, and

10   matters properly subject to judicial notice."  Outdoor Media Group, Inc. v. City of Beaumont, 506

11   F.3d 895, 899 (9th Cir. 2007) (citation and quotation marks omitted).  Although the court may not

12   consider a memorandum in opposition to a defendant's motion to dismiss to determine the

13   propriety of a Rule 12(b)(6) motion, see Schneider v. Cal. Dep't of Corrections, 151 F.3d 1194,

14   1197 n.1 (9th Cir. 1998), it may consider allegations raised in opposition papers in deciding

15   whether to grant leave to amend, see, e.g., Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir.

16   2003).

17        B.    *Claims Under 42 U.S.C. § 1983*

18        Section 1983 does not provide substantive rights; rather, it is "a method for vindicating

19   federal rights elsewhere conferred."  Albright v. Oliver, 510 U.S. 266, 271 (1994) (citations and

20   internal quotation marks omitted).  In pertinent part, Section 1983 states as follows:

21        Every person who, under color of any statute, ordinance, regulation, custom or
22        usage, of any State or Territory or the District of Columbia, subjects, or causes to
          be subjected, any citizen of the United States or other person within the
23        jurisdiction thereof to the deprivation of any rights, privileges, or immunities
          secured by the Constitution and laws, shall be liable to the party injured in any
24        action at law, suit in equity, or other proper proceeding for redress . . . .

25   42 U.S.C. § 1983.

26   ////

27   ////

28

12

To sufficiently plead a cognizable Section 1983 claim, a plaintiff must allege facts from which it may be inferred that (1) he or she was deprived of a federal right, and (2) a person who committed the alleged violation acted under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988); Williams v. Gorton, 529 F.2d 668, 670 (9th Cir. 1976).  Additionally, a plaintiff must allege that he or she suffered a specific injury and show a causal relationship between the defendant's conduct and the injury suffered.  See Rizzo v. Goode, 423 U.S. 362, 371-72 (1976).

C.    *Eighth Amendment Deliberate Indifference*

Inadequate medical care provided to a prisoner does not constitute cruel and unusual punishment cognizable under section 1983 unless the mistreatment rose to the level of "deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

> In the Ninth Circuit, the test for deliberate indifference consists of two parts. First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong— defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.

Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations and quotations omitted).

To establish deliberate indifference, a plaintiff must show that defendants knew of and disregarded an excessive risk to his health or safety "by failing to take reasonable measures to abate it."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  A defendant must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inferences."  Id.  The nature of a defendant's responses must be such that the defendant purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.  McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled in part on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).

1    A showing of merely inadvertent or even negligent medical care is not enough to establish

2    a constitutional violation.  Estelle, 429 U.S. at 105-06; Frost v. Agnos, 152 F.3d 1124, 1130 (9th

3    Cir. 1998).  A mere difference of opinion concerning the appropriate treatment cannot be the

4    basis for an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.

5    1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  Rather, the plaintiff must allege

6    facts sufficient to indicate a culpable state of mind on the part of the defendant.  Wilson v. Seiter,

7    501 U.S. 294, 297-99 (1991).  Accordingly, a difference of opinion about the proper course of

8    treatment does not constitute deliberate indifference, nor does a dispute between a prisoner and a

9    defendant over the necessity for or extent of medical treatment amount to a constitutional

10   violation.  See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild,

11   891 F.2d 240, 242 (9th Cir. 1989).  A defendant does not act with deliberate indifference if their

12   response to the risk is reasonable, even if that response is ultimately unsuccessful.  Farmer, 511

13   U.S. at 844-45.

14   III.    Motion to Dismiss Filed by State Defendants

15        A.    *Request for Judicial Notice*

16        As an initial matter, State defendants request that the court take judicial notice of the

17   following five documents filed in support of their motion to dismiss:

18        1)    A document entitled "What are the Symptoms of Atrial Fibrillation (AFib or

19            AF)?" publically available on the website of the American Heart Association at

20            http://www.heart.org/HEARTORG/Conditions/Arrhythmia/AboutArrhythmia.

21        2)    A document entitled "Myocardial Ischemia" publically available on the website of

22            the Mayo Clinic at www.mayoclinic.org/diseases-condition/myocardial-ischemia.

23        3)    Certain pages from a document entitled "Clinical Cardiology: New Frontiers,

24            Sudden Cardiac Death" publically available at www.circulationaha.org and the American

25            Heart Association's website.

26        4)    Licensing information for Alexander Fraley, M.D., from the California

27            Department of Consumer Affairs website at www.breeze.ca.gov and information from

28            www.healthgrades.com.

(5)     Licensing information for Brian Mundy, M.D., from the California Department of

Consumer Affairs website at www.breeze.ca.gov and information from

www.healthgrades.com.

(ECF No. 48-1.)

A judicially noticed fact must be one not subject to reasonable dispute in that it is either

(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate

and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Fed. R. Evid. 201(b).  "A court shall take judicial notice if requested by a party and supplied with

the necessary information."  Fed. R. Evid. 201(d).  Judicially noticed facts often consist of

matters of public record, such as prior court proceedings, see, e.g., Emrich v. Touche Ross & Co.,

846 F.2d 1190, 1198 (9th Cir. 1988); administrative materials, see, e.g., Barron v. Reich, 13 F.3d

1370, 1377 (9th Cir. 1994); or other court documents, see, e.g., Rothman v. Gregor, 220 F.3d 81,

92 (2d Cir. 2000) (taking judicial notice of a filed complaint as a public record).  Federal courts

may "take notice of proceedings in other courts, both within and without the federal judicial

system, if those proceedings have a direct relation to the matters at issue."  U.S. ex rel Robinson

Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992).

Generally, a court may not consider material beyond the complaint in ruling on a motion

to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Lee v. City of Los Angeles, 250

F.3d 668, 688 (9th Cir. 2001).  "However, '[a] court may take judicial notice of 'matters of public

record' without converting a motion to dismiss into a motion for summary judgment,' as long as

the facts noticed are not 'subject to reasonable dispute.'"  Intri-Plex Technologies, Inc. v. Crest

Grp., Inc., 499 F.3d 1048, 1052 (9th Cir. 2007) (quoting Lee, 250 F.3d at 689 (citation omitted));

see also United States v. Ritchie, 342 F.3d 903, 908-09 (9th Cir. 2003).

The court denies State defendants' request for judicial notice as moot as consideration of

the matters as to which judicial notice is requested would not alter the court's assessment of State

defendants' motion to dismiss.  Moreover, at least with regard to the first three documents

comprising State defendants' request, it appears that State defendants are not asking the court to

take judicial notice of the website pages, but the truth of the contents of those pages.  Such a

1   request is inappropriate under Federal Rule of Evidence 201.  See Ang v. Bimbo Bakeries USA,

2   Inc., 2013 WL 5407039, at *6 (N.D. Cal. Sept. 25, 2013) (declining to take judicial notice of

3   American Heart Association website pages because the defendant requested judicial notice of the

4   truth of the contents of those pages).

5         B.   *State Defendants' Request to Disregard and Strike the Declaration of Dr. Dali*

6               *Fan Attached to the First Amended Complaint*

7        State defendants also request in their motion to dismiss that the court disregard and strike

8   the declaration of Dr. Dali Fan attached as "Exhibit 30" to plaintiffs' first amended complaint.

9   State defendants argue that such purported expert testimony violates Federal Rule of Civil

10  Procedure 10(c), which provides that a "written instrument" attached to a complaint may be

11  considered part of the complaint for all purposes.

12       Generally, the types of instruments that fall within the scope of Rule 10(c) "'consist

13  largely of documentary evidence, specifically, contracts, notes, and other writings on which a

14  party's action or defense is based.'" DeMarco v. DepoTech Corp., 149 F. Supp. 2d 1212, 1220

15  (S.D. Cal. 2001) (quoting Rose v. Bartle, 871 F.2d 331, 339 n.3 (3d Cir. 1989)).  In contrast,

16  witness affidavits and other exhibits containing largely evidentiary material typically do not

17  qualify as "written instruments" under Rule 10(c).  See United States v. Ritchie, 342 F.3d 903,

18  908 (9th Cir.2003) (citing DeMarco, 149 F. Supp. 2d at 1219-21) ("Affidavits and declarations …

19  are not allowed as pleading exhibits unless they form the basis of the complaint."); Perkins v.

20  Silverstein, 939 F.2d 463, 467 n.2 (7th Cir. 1991) (holding that newspaper articles, commentaries,

21  and editorial cartoons referencing a scandal "are not the type of documentary evidence or 'written

22  instruments' which Rule 10(c) intended to be incorporated into … the complaint").  Courts have

23  granted motions to strike exhibits attached to complaints when those exhibits do not qualify as

24  "written instruments" under Rule 10(c).  See, e.g., DeMarco, 149 F. Supp. 2d at 1222 (striking an

25  expert affidavit attached to a complaint in securities fraud action); Montgomery v. Buege, 2009

26  WL 1034518, at *3 (E.D. Cal. Apr. 16, 2009) (granting motion to strike multiple exhibits from

27  complaint because they were "in the nature of evidence submitted to bolster allegations contained

28  in the complaint"); Galvan v. Yates, 2006 WL 1495261, at *4 (E.D. Cal. May 24, 2006) (striking

1    from a complaint witness declarations designed to substantiate allegations that the plaintiff

2    satisfied the presentment requirements of the California Tort Claims Act).

3        Here, the attached Dr. Fan declaration purports to provide expert testimony regarding the

4    medical significance of the September 10, 2010 SJGH echocardiogram results showing that

5    decedent had aortic stenosis and has been attached to the first amended complaint by plaintiffs in

6    order to controvert the medical conclusions allegedly made by Dr. Dharawat, the physician who

7    interpreted the results of that test.[2]  This declaration does not form the basis of the complaint, but

8    rather provides a purported expert's conclusions based on certain facts alleged in the first

9    amended complaint.  The court could not consider the contents of this exhibit in ruling on a

10   motion to dismiss for failure to state a claim without converting the motion into one for summary

11   judgment.  See Ritchie, 342 F.3d at 909 (holding that the district court could not have considered

12   a declaration that did not form the basis of a complaint and to which the complaint did not refer

13   without converting the Rule 12(b)(6) motion into a Rule 56 motion); Rose, 871 F.2d at 339 n.3

14   (explaining that treating affidavits as "written instruments" under Rule 10(c) would "blur the

15   distinction between summary judgment and dismissal for failure to state a claim").  Under the

16   present circumstances, the court finds that converting defendants' current motions to dismiss

17   would be improper, especially in light of the pleading deficiencies discussed in more detail below

18   with regard to the merits of defendants' pending motions to dismiss.

19       Plaintiffs argue in opposition to State defendants' request that Dr. Fan's declaration is

20   properly included in the first amended complaint pursuant to Federal Rule of Civil Procedure

21   56(c)(4).  However, Rule 56(c)(4) concerns affidavits and declarations used to support or oppose

22   a motion for summary judgment and none of the defendants nor plaintiffs have filed such a

23   motion as of this time.  As discussed above, considering such a declaration would require the

24   court to convert defendants' motions to dismiss into motions for summary judgment.  While it

25   may be that Dr. Fan's declaration could be introduced as evidence in support of or in opposition

26   to a properly noticed motion for summary judgment, this action is not in such a procedural

27   ────────────────

28   [2] Indeed, plaintiffs refer to Dr. Fan's declaration as "expert testimony" in their opposition to State
     defendants' motion to dismiss.  (ECF No. 54 at 20-21.)

1    posture at this juncture of the litigation and the court finds that converting defendants' motions to

2    dismiss into motions for summary judgment would be inappropriate under the present

3    circumstances.  State defendants' request for the court to disregard the Dr. Fan declaration

4    attached to the first amended complaint is well taken.  Accordingly, the court strikes Dr. Fan's

5    declaration from the first amended complaint and disregards it for purposes of considering

6    defendants' motions to dismiss.

7           C.      *Merits of State Defendants' Motion to Dismiss*

8           State defendants acknowledge that the allegations of the first amended complaint

9    demonstrate that decedent's aortic stenosis created a serious medical need throughout the span of

10   time alleged in the first amended complaint.  Accordingly, plaintiffs' allegations meet the first

11   requirement for a deliberate indifference claim.[3]  State defendants argue, however, that plaintiffs'

12   allegations fail to show that any of the State defendants acted with deliberate indifference to the

13   medical need created by decedent's aortic stenosis.  For the reasons discussed below, the court

14   agrees that plaintiffs fail to show that any of the State defendants acted with deliberate

15   indifference to the medical risk allegedly posed by that condition.

16          However, before the court addresses the reasons why the first amended complaint fails to

17   show that any of the State defendants acted with deliberate indifference, it first turns its attention

18   to plaintiffs' general assertion in its opposition to State defendants' motion that plaintiffs' alleged

19   facts demonstrate that decedent's aortic stenosis was medically "severe" as early as September

20   10, 2010, and required treatment in the form of aortic valve replacement surgery.  Plaintiffs

21   contend that such allegations are sufficient to show deliberate indifference as to all State

22   defendants.  Plaintiffs assert that their allegations show that aortic valve replacement surgery was

23   the only truly effective way to medically address decedent's condition given its alleged severity,

24   which means that each State defendant acted with deliberate indifference merely by not arranging

25   for decedent to undergo such treatment when he was under their care.  However, "neither an

26   inadvertent failure to provide adequate medical care, nor mere negligence or medical malpractice,

27   _____

28   [3] The other moving defendants also recognize that plaintiffs' allegations meet the first prong for a
     deliberate indifference claim.  (See ECF Nos. 45 at 6, 46-1 at 8, 49 at 13.)

1   nor a mere delay in medical care (without more), nor a difference of opinion over proper medical

2   treatment, is sufficient to constitute an Eighth Amendment violation." Clarke v. Okafor, 2013

3   WL 1614726, at *3 (C.D. Cal. Feb. 13, 2013), report and recommendation adopted, 2013 WL

4   1614680 (C.D. Cal. Apr. 15, 2013); Estelle, 429 U.S. at 105-06; Toguchi, 391 F.3d at 1058-60;

5   Jackson, 90 F.3d 330, 332; Sanchez, 891 F.2d at 242 (9th Cir. 1989); Shapley v. Nevada Bd. of

6   State Prison Commissioners, 766 F.2d 404, 407 (9th Cir. 1984).  Notwithstanding the fact that a

7   number of the documents attached to the first amended complaint appear to contradict plaintiffs'

8   conclusory assertion that decedent's aortic stenosis was "severe" as of September 10, 2010, and

9   that the only effective care decedent could have received for his aortic stenosis was valve

10   replacement surgery (see, e.g., FAC, Exhibit 5 at 1, Exhibit 18 at 6, Exhibit 28 at 2), the mere

11   alleged fact that State defendants did not provide him with such care, standing alone, is

12   insufficient to support plaintiffs' Eighth Amendment claims.  Indeed, plaintiffs' pleading must be

13   able to provide factual allegations giving rise to a plausible showing that each State defendant

14   engaged in "a purposeful act or failure to act" that resulted in the alleged harm to decedent.

15   McGuckin, 974 F.2d at 1060.  As discussed below, plaintiffs' factual allegations fail to make such

16   a showing with regard to any of the State defendants.

17                    1.      Dr. Shadday

18        State defendants argue that plaintiffs fail to allege facts showing that Dr. Shadday acted

19   with deliberate indifference to the medical threat posed by decedent's aortic stenosis.  Defendants

20   assert that the facts alleged in the first amended complaint regarding Dr. Shadday's role in

21   decedent's care at CSP Solano actually show that Dr. Shadday responded to the decedent's

22   serious condition in a reasonable manner under the alleged circumstances, therefore precluding a

23   finding that he acted with deliberate indifference.

24        The allegations in the first amended complaint regarding Dr. Shadday's involvement in

25   decedent's health care show that he saw and examined decedent during the limited period

26   between September 1, 2010, and September 17, 2010.  (FAC, Exhibit 3.)  During his first alleged

27   encounter with decedent on September 1, 2010, Dr. Shadday noted that decedent had a history of

28   aortic stenosis, among other conditions, that could have been contributing to decedent's claimed

1   shortness of breath and ordered that an x-ray be taken of decedent's chest to assist in that

2   determination.  (Id., Exhibit 3 at 4-5.)  During his second encounter with decedent, on September

3   9, 2010, Dr. Shadday noted that decedent had experienced prolonged shortness of breath over the

4   past several weeks and that decedent had been scheduled to have a cardiac catheterization done

5   on June 11, 2010, but that the procedure was cancelled because decedent had suffered a

6   gastrointestinal bleed on that day.  (Id., Exhibit 3 at 6-7.)  Based on this information, Dr. Shadday

7   decided to have decedent directly admitted "to SJGH for a cardiac eval[uation] for [shortness of

8   breath] and cardiac cath[eterization]."  (Id.)  Dr. Dharawat provided decedent with a cardiac

9   evaluation at SJGH the next day, which resulted in Dr. Dharawat diagnosing decedent with

10  "moderate" aortic stenosis.  (Id., Exhibit 5 at 1-2.)  After receiving these results, on September

11  17, 2010, Dr. Shadday issued an "urgent" physician request to have decedent undergo a pre-

12  operation pulmonary function test based on a determination that decedent had "severe [coronary

13  artery disease] & [aortic stenosis/mitral regurgitation]," thus making him a "possible candidate

14  for surgery."  (Id., Exhibit 3 at 8.)

15       Plaintiffs also attach to the first amended complaint a copy of a September 23, 2010

16  medical return report regarding decedent's consultation for a pulmonary function test that was

17  conducted by a registered nurse at CSP Solano, which was signed by the nurse and Dr. Shadday.

18  (Id., Exhibit 3 at 9.)  That report noted that decedent stated the following: "They gave me an x-ray

19  and they talked to me.  He said I need surgery."  (Id.)

20       While these allegations show that Dr. Shadday was aware decedent had aortic stenosis,

21  they do not show that he acted with deliberate indifference to the risk posed by that condition

22  during the time decedent was in his care.  Indeed, they show that he took reasonable medical steps

23  to address decedent's aortic stenosis and other medical issues under the circumstances that were

24  present during the brief time in which he was alleged to have treated decedent.  The medical

25  literature attached as part of the first amended complaint indicates that aortic stenosis may be

26  diagnosed in a patient and studied through the use of a chest x-ray, echocardiogram, or cardiac

27  catheterization (e.g., FAC, Exhibit 19 at 3, Exhibit 22 at 3, Exhibit 23 at 2), all of which Dr.

28  Shadday ordered for decedent after he was informed of decedent's history and claimed

1  symptoms.  Furthermore, after receiving  results of decedent's evaluation from SJGH, Dr.

2  Shadday made an urgent request to have decedent undergo a pulmonary function test, which the

3  medical literature attached as part of the first amended complaint suggests was reasonable given

4  decedent's diagnosis of "moderate" aortic stenosis.  (Id., Exhibit 24 at 4 ("[I]f echocardiographic

5  findings suggest only moderate aortic stenosis, further diagnostic testing (e.g., coronary

6  angiography, *pulmonary function testing*, arrhythmia evaluation) may be needed." (emphasis

7  added)).  In short, the first amended complaint's factual allegations regarding Dr. Shadday's

8  actions, on their face, fail to plausibly indicate that he acted with deliberate indifference to

9  decedent's serious medical need.  Instead, they show that the actions Dr. Shadday took in

10  response to the alleged risk posed by decedent's aortic stenosis at the time decedent was in his

11  care were reasonable under the circumstances.

12          In addition, the September 23, 2010 report similarly fails to plausibly show that Dr.

13  Shadday was aware that there was a recommendation that decedent undergo immediate aortic

14  valve replacement surgery.  The allegations of the first amended complaint fail to show that the

15  "surgery" decedent referred to during the September 23, 2010 follow-up, which was conducted by

16  a nurse, not Dr. Shadday, specifically meant aortic valve replacement surgery.  The allegations

17  show that Dr. Shadday merely reviewed that report and nothing in the first amended complaint

18  plausibly suggests he was aware that "surgery" meant valve replacement surgery.  Moreover, the

19  allegations contain no indication that a recommendation for such a procedure had been made by

20  any of decedent's physicians prior to September 23, 2010.  To the contrary, they show that no

21  such recommendation was made.  Furthermore, the physician at Doctors Medical Center who

22  allegedly conducted the pulmonary function test consult that was the subject of the September 23,

23  2010 follow-up allegedly stated later, on October 21, 2010, that decedent could go for cardiac

24  surgery with average risk for pulmonary complications, not that he should undergo such a

25  procedure (FAC, Exhibit 6 at 2), thus further demonstrating the implausibility of plaintiffs'

26  conclusory allegation that Dr. Shadday was aware that decedent specifically needed valve

27  replacement surgery and consciously disregarded that need.

28  ////

1    Plaintiffs argue in opposition to State defendants' motion that the alleged facts show that

2  Dr. Shadday acted with deliberate indifference by ordering a pulmonary function test for decedent

3  instead of sending him to a cardiac surgeon to determine his suitability for valve replacement

4  surgery after having reviewed the results of the SJGH evaluation.  In support of this theory,

5  plaintiffs argue the echocardiogram report showed that decedent actually suffered from "severe"

6  aortic stenosis, that a pulmonary function test was ineffective to treat aortic stenosis at that level

7  of severity, and that Dr. Shadday ordered that test in order to delay decedent from receiving

8  necessary valve replacement surgery.  However, such a theory is implausible given the

9  circumstances alleged in the first amended complaint.  The SJGH evaluation results attached to

10  the first amended complaint show that Dr. Dharawat diagnosed decedent with "moderate" aortic

11  stenosis and other allegations of the first amended complaint show that pulmonary function

12  testing was a medically acceptable course of treatment for aortic stenosis at that level of severity.

13  (FAC, Exhibit 5 at 1-3, Exhibit 24 at 4.)  While plaintiffs provide conclusory allegations that all

14  State defendants were aware that decedent had "severe" aortic stenosis based on those results and

15  that Dr. Dharawat had mischaracterized decedent's aortic stenosis as "moderate," there are no

16  alleged facts plausibly indicating that Dr. Shadday, or any of the other State defendants, had any

17  reason to doubt Dr. Dharawat's determination in that report that decedent had "moderate" aortic

18  stenosis or otherwise believed that the results demonstrated that decedent's aortic stenosis was

19  "severe" at that time.  See Paulsen, 559 F.3d at 1071 ("[The court is] not … required to accept as

20  true conclusory allegations that are contradicted by documents referred to in the complaint, and

21  [the court does] not necessarily assume the truth of legal conclusions merely because they are cast

22  in the form of factual allegations.").  Furthermore, to the extent that it can be inferred that Dr.

23  Shadday, or any other State defendant, improperly relied on Dr. Dharawat's diagnosis of

24  "moderate" aortic stenosis, such an inference, standing alone, is insufficient to support a claim for

25  deliberate indifference as it shows nothing more than mere inadvertence.[4]  See Estelle, 429 U.S.

26

27  [4] Plaintiffs also argue that the declaration of Dr. Dali Fan shows that Dr. Shadday acted with
    deliberate indifference because that declaration states that the common medical standard required
28  decedent to be reviewed for surgery by a cardiac surgeon based on the SJGH echocardiogram

1    at 105-06.

2          Without alleged facts showing that Dr. Shadday had an actual belief that decedent's aortic

3    stenosis was "severe," instead of "moderate" as the September 10, 2010 echocardiogram results

4    he reviewed showed, the first amended complaint fails to plausibly show that Dr. Shadday acted

5    with deliberate indifference by ordering a pulmonary function test for decedent instead of sending

6    him to a cardiac surgeon.  See Jackson, 90 F.3d at 332 ("[W]here a defendant has based his

7    actions on a medical judgment that either of two alternative courses of treatment would be

8    medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference,

9    as a matter of law.").

10         In short, the allegations of the first amended complaint show that Dr. Shadday provided

11   decedent with appropriate medical attention while decedent was under his care and did not act

12   with deliberate indifference to the medical need caused by decedent's aortic stenosis.  Therefore,

13   plaintiffs' Eighth Amendment claims against this defendant should be dismissed with prejudice.[5]

14              2.    Dr. McCue

15         Defendants argue that the first amended complaint fails to show that Dr. McCue acted

16   with deliberate indifference to the serious medical need presented by decedent's aortic stenosis

17   because the two instances during which he was alleged to have had contact with decedent fail to

18   plausibly show that he responded to decedent's medical need in a knowingly indifferent manner.

19

20   results showing that decedent had an aortic valve area of 0.9 cm² and the alleged facts show that
     Dr. Shadday did not follow such a procedure, instead referring decedent for a pulmonary function

21   test.  However, the court disregards Dr. Fan's declaration for the reasons discussed above as it
     cannot be considered a "written instrument" for purposes of Federal Rule of Civil Procedure

22   10(c).  Furthermore, even were the court to consider such a statement as an allegation of the first
     amended complaint, it fails to make a plausible showing that Dr. Shadday acted with deliberate

23   indifference because it merely indicates that Dr. Shadday may have acted negligently in ordering
     a pulmonary function test for decedent when the common medical standard called for decedent to

24   be reviewed by a cardiac surgeon to determine suitability for aortic valve replacement surgery.

25   Estelle, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or
     treating a medical condition does not state a valid claim of medical mistreatment under the Eighth

26   Amendment.").

27
     [5] The court discusses why the dismissal of plaintiffs' claims against Dr. Shadday and all other

28   defendants remaining in this action should be with prejudice in further detail below.

1    Dr. McCue's first alleged encounter with decedent occurred on October 19, 2011, when

2    Dr. McCue examined decedent in connection with decedent's request that his disability status be

3    reevaluated.  (FAC, Exhibit 10 at 1.)  During this examination, decedent "claim[ed] he [was] no

4    longer disabled."  (Id.)  After conducting an examination, which included a "complete geriatric

5    evaluation," Dr. McCue agreed with decedent that "he ha[d] recovered and no longer require[d]"

6    disabled status.  (Id.)  The second alleged encounter occurred on April 17, 2012, when decedent

7    had been referred to Dr. McCue at CSP Solano's high risk clinic by Dr. Hsieh for a routine

8    evaluation based on decedent's refusal to take his prescribed medicine regimen.  (Id., Exhibit 10

9    at 2-4.)  During this encounter, Dr. McCue educated decedent on the risks associated with not

10   taking his prescribed medications, but recognized that decedent was competent and had the right

11   to refuse such treatment even though Dr. McCue believed it to be a "stupid decision."  (Id.)

12   With regard to the first encounter, plaintiffs contend that Dr. McCue's failure to include

13   any mention of decedent's alleged ongoing symptoms of chest pain, shortness of breath, or

14   irregular heartbeat in his examination notes shows that he intentionally tried to conceal the fact

15   that decedent suffered from symptomatic aortic stenosis that necessitated valve replacement

16   surgery.  However, no such inference could be plausibly drawn from Dr. McCue's October 11,

17   2011 note attached to the first amended complaint.  First, this examination was conducted

18   because decedent claimed that he was no longer disabled.  Indeed, the notes for this encounter

19   show that decedent even denied he had heart-related problems and refused recommended

20   treatments for his various conditions.  (FAC, Exhibit 10 at 1.)  Furthermore, examination notes

21   from other physicians at CSP Solano attached to the complaint from the time period surrounding

22   the date of Dr. McCue's examination show that decedent consistently denied experiencing

23   shortness of breath, chest pain, or heart palpitations.  (See, e.g., id., Exhibit 11 at 1, 5, 10, 14.)

24   Accordingly, given the alleged nature of the examination Dr. McCue conducted and the alleged

25   factual circumstances surrounding that examination, it cannot be plausibly asserted that the non-

26   inclusion of a notation showing that decedent was experiencing chest pain, shortness of breath, or

27   irregular heartbeat demonstrates that Dr. McCue acted with deliberate indifference when

28   providing care to decedent.

1    Plaintiffs also assert in opposition to State defendants' motion that the April 17, 2012

2    report attached to the first amended complaint shows that Dr. McCue had initially included aortic

3    stenosis as item number six on his list of decedent's chronic problems, but had crossed out the

4    word "stenosis," replaced it with "sclerosis," and wrote below the cross-out "0 stenosis."  (Id.,

5    Exhibit 10 at 3.)  Plaintiffs contend that this cross-out and annotation in Dr. McCue's note shows

6    that he was aware that decedent had aortic stenosis and attempted to hide that fact by intentionally

7    misstating that he had a different condition.  However, even assuming that a reasonable inference

8    could be drawn from Dr. McCue's cross-out that he knew that decedent had aortic stenosis, it still

9    fails to plausibly show that Dr. McCue acted with deliberate indifference to decedent's medical

10   needs in making such an annotation.  The allegations show that the purpose of Dr. McCue's

11   second encounter with decedent was to interview and assess decedent in light of decedent's

12   refusal to take his prescribed medications, not to assess his cardiac condition or to re-determine

13   the course of care for his aortic stenosis or other cardiac conditions.  The alleged facts in the

14   attached medical records show that decedent had been diagnosed only with "moderate" aortic

15   stenosis as of the time he was under Dr. McCue's care and that decedent was being monitored

16   and provided care for that condition by other physicians at CSP Solano.  Nothing in the first

17   amended complaint plausibly indicates that Dr. McCue was to decide the course of decedent's

18   cardiac care or that Dr. McCue's cross-out somehow delayed or otherwise undermined the care

19   decedent was receiving at CSP Solano and elsewhere regarding his aortic stenosis, or any other

20   medical condition.

21   Finally, plaintiffs assert that Dr. McCue was aware of a recommendation stemming from

22   decedent's October 2011 pulmonary function test that decedent should undergo valve

23   replacement surgery.  Again, such a conclusory assertion is not plausibly supported by the factual

24   allegations of the first amended complaint.  The pulmonary function test to which plaintiffs refer

25   allegedly took place on October 21, 2010, and noted that decedent "can go for his cardiac surgery

26   with average risk for pulmonary complications."  (FAC, Exhibit 6 at 2.)  Even when construed in

27   a light most favorable to plaintiffs, this allegation does not show that there existed a specific

28   recommendation that decedent undergo aortic valve surgery.  The assessment noted that decedent

*could* undergo an undefined "cardiac" procedure with only average risk from a pulmonary standpoint, not that it was recommended that he receive such treatment.  In addition, while the October 21, 2010 report did specifically discuss decedent's aortic stenosis, the alleged facts show that decedent had multiple heart conditions and the report makes only a generic reference to "cardiac surgery."  Regardless, even construing the report's use of "cardiac surgery" in a light most favorable to plaintiffs as being a specific reference to aortic valve replacement surgery, the alleged fact remains that the report only stated that decedent could undergo such a procedure, not that he should.  In short, plaintiffs' assertion is not plausibly supported by the alleged facts.

Moreover, there is nothing in the first amended complaint's allegations showing that Dr. McCue had read the pulmonary function test report or was aware of its results through some other means.  Given the alleged purpose of Dr. McCue's two encounters with decedent and the circumstances under which they took place, it cannot be plausibly inferred that he was aware of the October 21, 2010 results just from his alleged interactions with decedent.

Because plaintiffs' allegations fail to show that Dr. McCue acted with deliberate indifference, their Eighth Amendment claims against him cannot be sustained.  Accordingly, it is recommended that decedent's claims against Dr. McCue be dismissed with prejudice.

3.    Dr. Lipson

State defendants argue that plaintiffs' deliberate indifference claims against Dr. Lipson should be dismissed because the allegations of the first amended complaint fail to plausibly demonstrate that Dr. Lipson engaged in any deliberate or malicious acts that could give rise to an inference that he acted with deliberate indifference to the medical need posed by decedent's aortic stenosis.  As with Dr. Shadday, they contend that the medical care Dr. Lipson allegedly provided decedent shows that he acted in a manner that could not be plausibly construed as demonstrating deliberate indifference.

Plaintiffs allege in the first amended complaint that Dr. Lipson issued four medical progress notes after examining decedent, on October 28, 2010, November 18, 2010, December 14, 2010, and July 5, 2011, and issued a health care services request that decedent undergo a Holter monitor test on April 7, 2011, that was approved by Dr. McAlpine.  Dr. Lipson's first

26

encounter with decedent on October 28, 2010, was for a follow-up of decedent's outpatient visits for right cataract extraction and pulmonary function testing.  (FAC, Exhibit 7 at 1-3.)  In his notes for this examination, Dr. Lipson stated that he had reviewed a cardiac catheterization report and that the report recommended that decedent undergo medical therapy for his cardiac condition at that time and receive a transthoracic echocardiogram "to make further assessment of his valves and need for surgery."  (Id.)  Dr. Lipson also noted that a referral for services form had already been filled out for decedent by his primary care physician so he could receive such an assessment by cardiology.  (Id.)

Dr. Lipson's second encounter with decedent was "for a followup and laboratories for his anemia" on November 18, 2010.  (Id., Exhibit 7 at 4-5.)  During this visit, Dr. Lipson examined decedent, noted that he had largely normal vital signs, and urged decedent to seek immediate medical evaluation from CSP Solano staff when he experienced chest pain given the risk associated with his heart issues.  (Id.)  He also noted that decedent was "on maximum medical therapy at this point" and scheduled decedent for a return visit in 30 days so that Dr. Lipson would have an opportunity to review the results from decedent's then-upcoming cardiology appointment and other test results.  (Id.)  Dr. Lipson conducted the return visit on December 14, 2010, when he noted that decedent had no new complaints and that decedent had an upcoming cardiology appointment later that month when he was to receive an echocardiogram and have his cardiac catheterization reviewed for consideration of further interventions regarding decedent's heart conditions.  (Id., Exhibit 7 at 6-8.)  On April 7, 2011, Dr. Lipson issued a health care services request recommending that decedent receive a Holter monitor test at an outpatient facility.  (Id., Exhibit 9 at 1.)  This request was approved by Dr. McAlpine the next day.  (Id.)

Dr. Lipson's last alleged interaction with decedent occurred on July 5, 2011, for a follow-up on an ophthalmology procedure and foot x-rays that decedent had undergone.  (Id., Exhibit 7 at 10-11.)  Dr. Lipson noted that decedent was "doing well," still refused to take many of his prescribed medications, and that decedent reported that his pulse felt occasionally irregular and he had difficulties taking deep breaths, but that he was not experiencing such difficulties at that time.  (Id.)  Dr. Lipson scheduled decedent for further laboratory studies, prescribed and renewed

1   certain medications, and scheduled decedent for a follow-up visit to occur on August 10, 2011.

2   (Id.)

3          On their face, Dr. Lipson's alleged actions in caring for decedent fail to show that he

4   exhibited deliberate indifference to the medical risk posed by decedent's aortic stenosis.  To the

5   contrary, they show that he provided reasonable care in the context of the alleged purpose for

6   each examination and attempted to ensure that decedent received continuing review and care from

7   CSP Solano's cardiology department commensurate with the alleged symptoms he was

8   exhibiting.  Such a factual showing fails to support a cognizable Eighth Amendment deliberate

9   indifference claim against Dr. Lipson.

10         Plaintiffs argue that it can be inferred that Dr. Lipson exhibited deliberate indifference to

11   the medical risk posed by decedent's aortic stenosis because his October 28, 2010 medical

12   progress note shows that he intentionally and maliciously mischaracterized the aortic valve area

13   finding contained in the September 10, 2010 echocardiogram report from SJGH as showing that

14   decedent had an aortic valve area between 1.1 and 1.2 cm² when that report actually showed that

15   decedent had an aortic valve area of 0.9 cm².  However, such an assertion is implausible under the

16   facts alleged in the complaint because the copy of Dr. Lipson's October 28, 2010 medical

17   progress note attached to the first amended complaint demonstrates that his description of

18   decedent's aortic valve area was a part of his summarization of the results of a "cardiac

19   catheterization report," a procedure entirely different from the echocardiogram performed at

20   SJGH on September 10, 2010.  (FAC, Exhibit 7 at 1.)  Nothing in any of the attached documents

21   on which plaintiffs' claims against Dr. Lipson rely believably infer that he manipulated the

22   September 10, 2010 echocardiogram findings in order to downgrade or otherwise mischaracterize

23   the severity of decedent's aortic stenosis.  Just because plaintiffs conclusorily allege in their first

24   amended complaint that Dr. Lipson intentionally mischaracterized the results of decedent's

25   September 10, 2010 echocardiogram in his October 28, 2010 note does not mean that the court

26   must accept such an assertion as true, especially given that such an assertion is clearly

27   contradicted by the attached records.  See Paulsen, 559 F.3d at 1071.

28   ////

Plaintiffs also contend that the allegations show that Dr. Lipson disregarded an October 21, 2010 pulmonary function test report recommending that decedent undergo aortic valve surgery. However, as discussed above with regard to Dr. McCue, plaintiffs' conclusory assertion is not supported by the facts alleged in the complaint because the October 21, 2010 report attached to their pleading cannot be plausibly construed as containing a recommendation that decedent undergo such a procedure.

In short, the allegations of the first amended complaint fail to plausibly show that Dr. Lipson acted with deliberate indifference to the serious medical need created by decedent's aortic stenosis. Therefore, plaintiffs' Eighth Amendment claims against this defendant should be dismissed with prejudice.

4.      Dr. McAlpine

With regard to Dr. McAlpine, State defendants assert that plaintiffs' factual allegations show only that he approved of a recommendation by Dr. Lipson that decedent undergo a Holter monitor test on April 7, 2011, and of a recommendation by Dr. Hsieh to visit Dr. McCue at CSP Solano's high risk clinic on February 3, 2012, neither of which are sufficient to support a showing that Dr. McAlpine acted with deliberate indifference towards decedent's aortic stenosis.

The only factual allegations in the first amended complaint regarding Dr. McAlpine's role in decedent's medical treatment at CSP Solano are that he was a supervising physician at that facility and had authorized a request by Dr. Lipson on April 8, 2011, to have decedent undergo a Holter monitor test based on a principle diagnosis of paroxysmal atrial fibrilation and dizziness provided by Dr. Lipson. (FAC ¶ 68, Exhibit 9.) The medical records attached to the complaint also show that Dr. McAlpine approved another request by Dr. Hsieh on February 3, 2012, to have decedent receive routine treatment by Dr. McCue at CSP Solano's high risk clinic in light of decedent's refusal to take medicines that had been prescribed to him as treatment for his multiple medical problems. (Id., Exhibit 10 at 2.)

These factual allegations fail to plausibly show that Dr. McAlpine deliberately disregarded the medical need posed by decedent's aortic stenosis by merely approving the Holter monitor test and the high risk clinic requests. Moreover, plaintiffs fail to plausibly show that Dr.

29

1   McAlpine was even aware that decedent had aortic stenosis during either of the instances he was

2   allegedly involved in decedent's care.  Plaintiffs do not allege that Dr. McAlpine read any of the

3   test results showing that decedent had been diagnosed with aortic stenosis, or any of the other

4   documents allegedly indicating that decedent suffered from such a condition.  Nor do they allege

5   facts plausibly showing the other State defendants who were allegedly aware of decedent's aortic

6   stenosis relayed information of that condition to Dr. McAlpine.  In short, plaintiffs' factual

7   allegations fail to show that Dr. McAlpine was even aware of decedent's alleged medical need

8   arising from his aortic stenosis, let alone having acted with deliberate indifference towards any

9   medical need arising from that condition.

10          Furthermore, Dr. McAlpine's alleged role as a supervisory physician at CSP Solano,

11   without more, does not create a plausible inference that he was aware of decedent's alleged aortic

12   stenosis.  The first amended complaint contains only the conclusory allegation that Dr. McAlpine

13   was aware of decedent's aortic stenosis and the medical risk that condition posed.  (Id. ¶ 187.)

14   However, none of the factual allegations in the first amended complaint plausibly support this

15   conclusory assertion and the court does not have to assume the truth of the legal conclusions

16   asserted by plaintiffs even though they are cast in the form of factual allegations.  Paulsen, 559

17   F.3d at 1071 (the court does "not necessarily assume the truth of legal conclusions merely

18   because they are cast in the form of factual allegations.").

19          In the absence of factual allegations showing that Dr. McAlpine was aware of decedent's

20   aortic stenosis, plaintiffs' deliberate indifference claims against Dr. McAlpine based on that

21   condition must fail.  Farmer, 511 U.S. at 837.  Accordingly, plaintiffs' Eighth Amendment claims

22   against Dr. McAlpine should be dismissed with prejudice.

23                  5.      Dr. Hsieh

24          State defendants argue that the first amended complaint fails to show that Dr. Hsieh acted

25   with deliberate indifference to decedent's serious medical need stemming from his aortic stenosis

26   because the medical records attached to that pleading demonstrate that Dr. Hsieh repeatedly

27   examined decedent and provided appropriate care given the information available to him.

28   ////

1    Plaintiffs fail to allege facts plausibly showing that Dr. Hsieh was aware that decedent

2  suffered from aortic stenosis.  Indeed, the medical records allegedly issued by Dr. Hsieh attached

3  to the first amended complaint do not show that Dr. Hsieh had read the medical reports indicating

4  that decedent had been diagnosed with aortic stenosis.  The only physicians plaintiffs allege Dr.

5  Hsieh had any contact with regarding decedent's care at CSP Solano were Dr. McCue and Dr.

6  McAlpine, which contacts were minimal.  The alleged facts show only that Dr. Hsieh had issued a

7  routine referral to Dr. McCue for an evaluation of decedent in light of decedent's refusal to take

8  his prescribed medications and that Dr. McAlpine approved of that referral.  It cannot be

9  believably inferred that Dr. Hsieh obtained knowledge that decedent had aortic stenosis, let alone

10  that such a condition called for immediate valve replacement surgery, through these alleged

11  interactions with these other physicians.  While plaintiffs make the conclusory allegation in their

12  first amended complaint that Dr. Hsieh was aware of decedent's aortic stenosis and the threat to

13  his health it posed, the factual allegations of the complaint do not provide plausible support for

14  such a claim.  See Paulsen, 559 F.3d at 1071.

15    Furthermore, the records attached to the first amended complaint with regard to Dr. Hsieh

16  show that he provided decedent with numerous examinations between September 2, 2011, and

17  December 28, 2012.  (FAC, Exhibit 11.)  During this time, Dr. Hsieh allegedly noted that

18  decedent did not have any health complaints and that his objective indicators were consistently

19  within normal limits, and repeatedly tried to provide decedent with recommended medicinal

20  treatment despite decedent's repeated refusal of such treatment.  (Id.)  Dr. Hsieh further noted the

21  care decedent was receiving elsewhere for his medical conditions, including for his cardiac

22  conditions.  (Id.)  Given the information allegedly provided to Dr. Hsieh regarding the state of

23  decedent's health over the course of time decedent was in his care, it cannot be plausibly asserted

24  that his treatment of decedent was undertaken with deliberate indifference to decedent's medical

25  need.

26  ////

27  ////

28  ////

31

1    Plaintiffs argue in opposition that the allegations in the first amended complaint show that

2    Dr. Hsieh was aware of and purposefully tried to conceal the fact that decedent had reported

3    experiencing chest pain and shortness of breath by Dr. Hsieh stating that decedent had not been

4    experiencing such symptoms, both of which symptoms could indicate aortic stenosis.  Plaintiffs

5    contend these allegations are sufficient to show that Dr. Hsieh acted with deliberate disregard to

6    decedent's aortic stenosis because he repeatedly provided decedent a regimen of care that did not

7    properly treat that condition while trying to conceal its symptoms.  However, the mere alleged

8    fact that Dr. Hsieh was aware of symptoms that could indicate that decedent had symptomatic

9    aortic stenosis, standing by itself, is insufficient to create a plausible inference that he was aware

10   that decedent was suffering from that condition, especially in light of the fact that the allegations

11   show that decedent also suffered from numerous other health conditions for which chest pain and

12   shortness of breath could have been symptoms.  (See, e.g., FAC, Exhibit 11.)  Given the absence

13   of any factual allegations plausibly showing that Dr. Hsieh was actually aware that decedent

14   suffered from aortic stenosis, the mere fact that he was aware that decedent experienced

15   symptoms that could indicate aortic stenosis, but were in no way unique to that condition, is

16   insufficient to show deliberate indifference.  See Snow v. McDaniel, 681 F.3d 978, 988 (9th Cir.

17   2012) (quoting Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)) ("To show deliberate

18   indifference, the plaintiff 'must show that the course of treatment the doctors chose was medically

19   unacceptable under the circumstances' and that the *defendants 'chose this course in conscious*

20   *disregard of an excessive risk to plaintiff's health*.'" (emphasis added)).

21   Plaintiffs also argue that the alleged facts show that Dr. Hsieh never checked decedent's

22   heart with a stethoscope or conducted any other physical examination techniques that could have

23   informed him of the condition of decedent's heart and decedent's need for further examination

24   and eventual surgery for aortic stenosis.  However, such allegations in the context of the other

25   allegations in the first amended complaint show, at most, that Dr. Hsieh may have acted

26   negligently when examining decedent, which is insufficient to sustain a claim for deliberate

27   indifference.  Estelle, 429 U.S. at 105-06; Frost, 152 F.3d at 1130.

28   ////

1        Absent factual allegations giving rise to at least a plausible inference that Dr. Hsieh was

2    aware of the reports diagnosing decedent with aortic stenosis, or some other information that

3    would indicate that he knew that decedent had that specific condition during the time he was

4    allegedly treating decedent, plaintiffs cannot show that Dr. Hsieh's alleged actions or inactions

5    were carried out with deliberate indifference to the risk that serious medical condition posed.

6    Plaintiffs' allegations do not provide such an inference.  Accordingly, plaintiffs' deliberate

7    indifference claims against Dr. Hsieh should be dismissed with prejudice.

8    IV.    Motions to Dismiss Filed by Vacavalley and Dr. Bunuan

9           A.    *Plaintiffs' Request for Judicial Notice*

10       In support of their oppositions to the motions to dismiss filed by Vacavalley and Dr.

11   Bunuan, plaintiffs request that the court take judicial notice of a copy of a "Multidisciplinary

12   Patient Transfer Form" issued by Vacavalley on March 11, 2013, approving decedent's transfer

13   from Vacavalley's hospital to SJGH.  (ECF No. 51-1.)  The court denies plaintiffs' request

14   because the document is not a document that is either "generally known within the territorial

15   jurisdiction of this court" or "capable of accurate and ready determination by resort to sources

16   whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.

17          B.    *Merits of Dr. Bunuan's and Vacavalley's Motions to Dismiss*

18       Defendants Vacavalley and Dr. Bunuan argue that plaintiffs' Eight Amendment claims

19   against them should be dismissed because the alleged conduct plaintiffs attribute to them in the

20   first amended complaint falls short of plausibly showing that they acted with deliberate

21   indifference.

22       The allegations of the first amended complaint show that decedent was taken to

23   Vacavalley on March 10, 2013, after he suffered a syncopal episode at CSP Solano.  (FAC ¶ 90,

24   Exhibit 13 at 1-2.)  On March 11, 2013, a 2-D echocardiogram of decedent's heart was conducted

25   at Vacavalley and reviewed by a cardiologist who found that decedent had "severe" aortic

26   stenosis and noted "concern that [decedent] may need cardiac evaluation for possible surgery"

27   and "that the severe aortic stenosis may be the cause of [decedent's] syncopal episode."  (Id.,

28   Exhibit 13 at 2.)  Later on March 11, 2013, Dr. Bunuan ordered decedent to be transferred from

1    Vacavalley to SJGH with a recommendation that decedent receive a "cardiology evaluation to see

2    if aortic valve replacement is required."  (Id. ¶ 93, Exhibit 13 at 1, 6.)  Plaintiffs' claim is not

3    premised on any care allegedly provided by Vacavalley or Dr. Bunuan beyond this brief, single-

4    day period.[6]

5                    1.    Dr. Bunuan

6          Plaintiffs premise their deliberate indifference claim against Dr. Bunuan on the assertion

7    that he deliberately transferred decedent to SJGH instead of another care facility on March 11,

8    2013, knowing that SJGH could not evaluate or perform an aortic valve replacement surgery on

9    decedent in a purposeful attempt to delay decedent from receiving proper care.  (Id. ¶ 248.)

10   Plaintiffs base this assertion on the alleged fact that decedent's death summary from SJGH dated

11   March 21, 2013, noted that it had been recommended on March 13, 2013, after decedent had

12   undergone a repeat cardiac catheterization that decedent be "evaluated by [a] cardiothoracic

13   surgeon at a tertiary care center as our facility is not able to perform such an intervention."  (Id.

14   ¶¶ 101, 218, Exhibit 5 at 10, Exhibit 14 at 4.)  However, the attached medical records show that

15   decedent was transferred from Vacavalley to SJGH for the purpose of receiving a "cardiac

16   [follow-up]", which he did receive at SJGH on March 13, 2013, in the form of a cardiac

17   catheterization.  (Id., Exhibit 13 at 6.)  It was after this follow-up examination—after decedent

18   had left the care of Dr. Bunuan and Vacavalley—that it was recommended that decedent receive

19   valve replacement surgery.  (Id., Exhibit 5 at 10.)  Nothing in the attached documents on which

20   plaintiffs' allegations against Dr. Bunuan and Vacavalley are based indicates that decedent was

21   sent to SJGH for the purpose of receiving aortic valve replacement surgery, or that there was a

22   recommendation to Dr. Bunuan or any other physician at Vacavalley that decedent should

23   immediately undergo such a procedure instead of receiving further evaluation.  Indeed, the first

24   amended complaint shows that the only recommendation known to Dr. Bunuan at the time of the

25   _____

26   [6] Plaintiffs also allege that decedent was admitted to Vacavalley between March 23, 2010 and
     March 25, 2010 for care regarding the stroke he suffered on March 23, 2010, where he received
27   treatment from a physician other than Dr. Bunuan.  (FAC ¶¶ 20-27.)  However, plaintiffs' Eighth
     Amendment claim against Vacavalley is premised solely on its alleged involvement in
28   transferring decedent to SJGH on March 11, 2013.  (Id. ¶ 248.)

1  transfer was to have decedent undergo a further evaluation to determine whether he should

2  receive surgery.  (Id., Exhibit 13 at 2.)  Accordingly, plaintiffs' conclusory assertion that Dr.

3  Bunuan had decedent transferred with the knowledge that SJGH could not provide decedent with

4  an adequate and recommended degree of care is unsupported by the allegations.

5          Furthermore, decedent's attached medical records from the time of his transfer from

6  Vacavalley to SJGH fail to demonstrate that the decision to transfer decedent with a

7  recommendation for follow-up evaluation was anything but a reasonable response to the risk

8  posed by decedent's physical condition at that time.  At the time of his transfer, decedent

9  "denie[d] any chest pain, shortness of breath, nausea, or vomiting."  (Id., Exhibit 13 at 2.)  It was

10  further noted that decedent's condition was "stable" at the time he was discharged from

11  Vacavalley.  (Id., Exhibit 13 at 7.)  While the alleged facts may indicate that decedent may not

12  have died had he received valve replacement surgery in the days prior to his death, it is

13  implausible to suggest that Dr. Bunuan could have reasonably foreseen that decedent would not

14  receive the appropriate degree of care at the time he transferred him to SJGH under the

15  circumstances alleged.  Given the relative stability of decedent's alleged condition at the time of

16  his transfer, it cannot be said that Dr. Bunuan's alleged course of action was anything other than

17  reasonable, even if the care provided to him at SJGH was ultimately unsuccessful in saving his

18  life.  See Farmer, 511 U.S. at 844 ("[Defendants] who actually knew of a substantial risk to

19  inmate health or safety may be found free from liability if they responded reasonably to the risk,

20  even if the harm ultimately was not averted.").

21          Plaintiffs also argue that the attached medical records show that Dr. Bunuan's decision to

22  transfer decedent from Vacavalley to SJGH was made solely because SJGH had available

23  "prisoner beds," thus demonstrating that the transfer was made with indifference to decedent's

24  medical need because no credence was given to decedent's actual medical condition in making

25  that decision.  However, a review of the document attached to the first amended complaint on

26  which plaintiffs rely to support this assertion fails to plausibly support such a contention.  The

27  document merely states that an SJGH employee told a case worker at Vacavalley that "there are

28  tele beds available at the MGU unit" of SJGH if it was to be decided that decedent's then-pending

1    echocardiogram results necessitated further care.  (FAC, Exhibit 13 at 6.)  Nothing in this

2    document or any of the other factual allegations in the first amended complaint shows that the

3    transfer was made solely because prisoner beds were available at SJGH.  To the contrary, the

4    factual allegations show that decedent was transferred for follow-up testing to determine whether

5    valve surgery would be necessary, which was a reasonable response to the risk posed by

6    decedent's condition under the alleged circumstances.

7        In sum the facts alleged in the first amended complaint simply do not meet the high

8    threshold necessary to demonstrate that Dr. Bunuan acted with deliberate indifference in

9    authorizing decedent's transfer to SJGH.  Accordingly, plaintiffs' deliberate indifference claim

10   against Dr. Bunuan must be dismissed with prejudice.

11                    2.    Vacavalley

12       With regard to Vacavalley, it appears that much of plaintiffs' deliberate indifference claim

13   against this defendant is premised on its vicarious liability for the alleged actions of Dr. Bunuan.

14   However, such a theory of liability cannot support such a claim against a private entity such as

15   Vacavalley under 42 U.S.C. § 1983.  Section 1983 liability against a private entity cannot be

16   based solely on respondeat superior, i.e., vicarious liability for the acts or omissions of the

17   entity's employees.  White, 2009 WL 817937 at *3 (citations omitted); Warwick v. University of

18   the Pacific, 2010 WL 2680817, *8 n. 11 (N.D. Cal. July 6, 2010) (citing cases), motion for relief

19   from judgment denied, 2011 WL 5573939 (N.D. Cal. Nov. 15, 2011).  Rather, a private employer

20   is liable only "when the employer is the driving force behind the constitutional violations alleged

21   against its employees, who are operating as state actors."  Stanley v. Goodwin, 475 F. Supp. 2d

22   1026, 1038 (D. Haw. 2006), aff'd, 262 Fed. Appx. 786 (9th Cir. 2007).  Accordingly "to state a

23   claim under § 1983 against a private entity . . . , a plaintiff must allege facts to support that his

24   constitutional rights were violated as a result of a policy, decision, or custom promulgated or

25   endorsed by the private entity."  White, 2009 WL 817937, at *3 (collecting cases); Sanders v.

26   Sears, Roebuck & Co., 984 F.2d 972, 975 (8th Cir. 1993) ("a corporation acting under color of

27   state law will only be held liable under § 1983 for its own unconstitutional policies—i.e., a

28   policy, custom or action by those who represent [the private entity's] official policy that inflicts

36

1   injury actionable under § 1983.") (citing Monell v. Department of Social Services of City of New

2   York, 436 U.S. 658, 690, 694 (1978)); see also King v. Ashley, 2014 WL 3689582, at *3 (E.D.

3   Cal. July 23, 2014).

4          Plaintiffs also allege that Vacavalley "transferred [decedent] because of a deliberate

5   policy, custom and practice for CSP Solano prisoners and not for [decedent's] specific medical

6   need." (FAC ¶ 219.)  However, plaintiffs in no way attribute this alleged custom or policy as

7   Vacavalley's own policy or custom and only allege its existence in the vaguest of terms.

8          In their factual allegations, plaintiffs also quote the following from a document attached as

9   "Exhibit 29" to the first amended complaint:  "Hospitals and outside consultants are assigned the

10  Clinical Services Management based on institutional need."  (Id. ¶ 219, Exhibit 29.)  Construed

11  liberally, it appears that plaintiffs included this statement in their allegations to infer that this

12  statement constituted the policy or custom allegedly underlying their claim against Vacavalley.

13  However, a review of the attached document from which plaintiffs quote shows that this inference

14  is not plausible given plaintiffs' other allegations.  Exhibit 29 to the first amended complaint is a

15  letter from California Correctional Health Care Services to plaintiff Kathy Thaut dated August 6,

16  2015, that was written in response to a request she made regarding the health care provided to her

17  brother, plaintiff David Edwards,[7] during his incarceration at CSP Solano.  (Id. at Exhibit 29.)

18  Towards the end of this letter, it is noted that:

19              [I]f in the future, the assigned Primary Care Physician determines
                [plaintiff David] Edwards is in need of cardiac care, it will be done
20              with a provider chosen by CDCR.  The patient does have the right
                to refuse treatment; however, may not be selective in the choice of
21              hospital provider.  Hospitals and outside consultants are assigned
                the Clinical Services Management based on institutional need.
22

23  (Id.)  There are no indications in the document or in the allegations themselves that this alleged

24  "policy" was applied to decedent's care, was in place at the time decedent was transferred

25  between Vacavalley and SJGH in March of 2013, or that Vacavalley had "promulgated or

26

27  ───────────────────
    [7] The court hereinafter refers to plaintiff David Edwards as such in order to avoid confusion
    between this plaintiff and the decedent David Edwards, who is alleged to have been plaintiff
28  David Edwards' father.  (FAC ¶ 1.)

1  endorsed" it.  Indeed, it appears from the above allegations regarding the alleged "policy" that it

2  was CDCR that developed the policy and decided when an inmate was assigned to an outside care

3  provider, not Vacavalley or any other outside care provider.

4         Because the allegations of the first amended complaint fail to plausibly allege that the

5  moving force behind decedent's death was "a policy, decision, or custom promulgated or

6  endorsed by" Vacavalley, plaintiffs' claims against that defendant must be dismissed with

7  prejudice.  <u>White</u>, 2009 WL 817937 at *3; <u>Sanders</u>, 984 F.2d at 975; <u>Stanley</u>, 475 F. Supp. 2d at

8  1038.

9  V.     <u>Motion to Dismiss filed by Dr. Dharawat</u>

10        A.     *Request for Judicial Notice*

11        In support of his motion to dismiss, Dr. Dharawat requests that the court take judicial

12  notice of the following six documents:

13        1)     The complaint filed in the Solano County Superior Court in case number

14        FSC043349, filed on or about April 16, 2014;

15        2)     A demurrer filed by County of San Joaquin and Priyasheelta Nand, MD in Solano

16        County Superior Court case number FSC043349 on June 2, 2014;

17        3)     Plaintiffs' request for dismissal of County of San Joaquin and Priyasheelta Nand,

18        MD with prejudice in Solano County Superior Court case number FSC043349, filed July

19        2, 2014;

20        4)     A notice of entry of dismissal, filed in Solano County Superior Court case number

21        FSC043349 on July 21, 2014;

22        5)     Plaintiffs' complaint for damages filed in the present action at ECF No. 1.

23        6)     Plaintiffs' first amended complaint for damages filed in the present action at ECF

24               No. 43.

25  (ECF No. 45 at 14-105.)

26        The first five documents for which Dr. Dharawat requests judicial notice are the same five

27  documents the court took judicial notice of through its order addressing defendants' prior motions

28  to dismiss plaintiffs' original complaint.  (<u>See</u> ECF No. 32 at 18.)  As discussed in that prior

38

1    order, these documents are properly subject to judicial notice.  (Id.)  Plaintiffs' first amended

2    complaint in the present action is also a judicially-noticeable document that is not subject to

3    reasonable dispute.  See Barron v. Reich, 13 F.3d 1370, 1377 (9th Cir. 1994); MGIC Indem. Co.

4    v. Weisman, 803 F.2d 500, 505 (9th Cir. 1986); United States v. Wilson, 631 F.2d 118, 119 (9th

5    Cir. 1980); Coats v. McDonald, 2010 WL 2991716, at *2 (E.D. Cal. July 29, 2010) (noting "[a]

6    court may take judicial notice of court records" and taking judicial notice of the plaintiff's

7    complaint).  Accordingly, the court also takes judicial notice of this document.

8        B.      *Merits of Dr. Dharawat's Motion to Dismiss*

9            Dr. Dharawat argues that plaintiffs' Eighth Amendment claim against him should be

10   dismissed under the doctrine of claim preclusion because the allegations of the first amended

11   complaint clearly show he is in privity with the County of San Joaquin d.b.a. San Joaquin General

12   Hospital ("SJGH"), a defendant to a previous state court action plaintiffs filed in the Solano

13   County Superior Court and voluntarily dismissed with prejudice that was based on the same

14   conduct alleged against Dr. Dharawat in the present action.[8]

15           The doctrine of claim preclusion, also known as res judicata, "bars litigation in a

16   subsequent action of any claims that were raised or could have been raised in the prior action."

17   Owens v. Kaiser Foundation Health Plan, Inc., 244 F.3d 708, 713 (9th Cir. 2001) (quoting

18   Western Radio Servs. Co. v. Glickman, 123 F.3d 1189, 1192 (9th Cir. 1997)) (internal quotation

19   marks omitted).  Generally, when federal-court jurisdiction is based on the presence of a federal

20   question, federal preclusion doctrine applies.  See Taylor v. Sturgell, 553 U.S. 880, 891 (2008);

21   Heiser v. Woodruff, 327 U.S. 726, 733 (1946).  However, whether a prior judgment by a state

22   court precludes a subsequent section 1983 action in federal court is a matter of state law.  Migra

23   v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984) ("It is now settled that a federal

24   court must give to a state-court judgment the same preclusive effect as would be given that

25   judgment under the law of the State in which the judgment was rendered.").  Under California

26

27   _____

[8] SJGH was previously named as a defendant to the present action as well, but was dismissed
28   with prejudice because plaintiffs' Eighth Amendment claim against it was barred under the
     doctrine of claim preclusion.  (ECF Nos. 32, 55.)

1  law, an action is barred under the doctrine of claim preclusion if:  (1) there has been a final

2  determination on the merits, (2) on the same cause of action, (3) between the same parties or

3  parties in privity with them.  Tensor Group v. City of Glendale, 14 Cal. App. 4th 154, 160 (1993).

4         "California law approaches the [cause of action] issue by focusing on the 'primary right'

5  at stake:  if two actions involve the same injury to the plaintiff and the same wrong by the

6  defendant then the same primary right is at stake even if in the second suit the plaintiff pleads

7  different theories of recovery, seeks different forms of relief and/or adds new facts supporting

8  recovery."  Eichman v. Fotomat Corp., 147 Cal. App. 3d 1170, 1174 (1983) (citing Slater v.

9  Blackwood, 15 Cal. 3d 791, 795 (1975)).  "If the same primary right is involved in two actions,

10  judgment in the first bars consideration not only of all matters actually raised in the first suit, but

11  also all matters which could have been raised."  Id. at 1175.  "Thus, under the primary rights

12  theory, the determinative factor is the harm suffered."  Boeken v. Philip Morris USA, Inc., 48

13  Cal.4th 788, 798 (2010).

14         "Under California law, voluntary dismissal of an action with prejudice constitutes final

15  determination on the merits and satisfies the requirement for res judicata."  Sierra Mgmt., Inc. v.

16  City of Sonoma, 1996 WL 147632, at *3 (N.D. Cal. Mar. 27, 1996) (citing Roybal v. Univ. Ford,

17  207 Cal. App. 3d 1080, 1085 (1989)).

18         In order to meet the third prong of the res judicata analysis under California law, a party to

19  the present action must have either been a party to or in privity with a party in the prior action.  A

20  party may be considered to be in privity "when, in certain limited circumstances, [that party],

21  although not a party [to the previous litigation], has his interests adequately represented by

22  someone with the same interests who [was] a party [to that litigation]."  Richards v. Jefferson

23  Cnty., Ala., 517 U.S. 793, 798 (1996) (quoting Martin v. Wilks, 490 U.S. 755, 762 n.2 (1989)).

24  However, the fact that a party to the present action could have been joined as a party in the prior

25  action is of little or no significance to determining privity when that party was not actually joined.

26  See Pancoast v. Russell, 148 Cal. App. 2d 909, 914 (1957).  Similarly, the existence of a

27  principle-agent relationship between a party to the previous litigation and a non-party does not

28  necessarily signal the existence of privity.  Generally, the liability of the principle or agent that

1    was not a party to the prior lawsuit must be "derivative from or dependent upon the culpability

2    of" the principle or agent who was a party in the original action.  Triano v. F.E. Booth & Co., 120

3    Cal. App. 345 (1932) (citing Bradley v. Rosenthal, 154 Cal. 420 (1908)).

4                    1.     Final Adjudication on the Merits

5        Here, there has been a final determination on the merits in a prior state court action

6    because the judicially noticed documents demonstrate that all plaintiffs voluntarily dismissed

7    their causes of action against Dr. Dharawat's employer, SJGH, and Dr. Priyasheelta Nand,

8    another physician at SJGH, in their prior state court action with prejudice.  (ECF No. 45 at 83.)

9    This dismissal constituted a final determination on the merits for res judicata purposes under

10    California state law.  Roybal, 207 Cal. App. 3d at 1085; see also Johnson v. San Joaquin Cnty.

11    Sheriff's Dep't, 2015 WL 1499086, at *3 (E.D. Cal. Mar. 31, 2015) (finding that plaintiff's

12    voluntary dismissal of state tort action with prejudice constituted a final judgement on the merits

13    for res judicata purposes under California law when the plaintiff dismissed the state court action

14    in light of a demurrer arguing that plaintiff failed to timely file a government tort claim).

15                    2.     Same Primary Rights

16        While plaintiffs' state court action was based on state tort law and their present claims are

17    premised as Eighth Amendment claims brought pursuant to 42 U.S.C. § 1983, this difference is of

18    no consequence to a determination under California's "primary rights" analysis because the

19    claims asserted in the prior action and the present action are all based on the exact same factual

20    background and alleged injury, i.e. decedent experiencing pain and suffering, and ultimately

21    death, due to defendants' actions, or inactions, while decedent was in defendants' care between

22    March 2010 and his death on March 21, 2013.  See Boeken, 48 Cal. 4th at 798; Eichman, 147

23    Cal. App. 3d at 1175; Johnson, 2015 WL 1499086, at *4 (finding plaintiff's section 1983 claim to

24    assert the same "primary right" as negligence claim asserted in prior state action because both

25    claims were based on the same alleged action and injury)  Furthermore, plaintiffs could have

26    brought their section 1983 claim based on deliberate indifference against SJGH in their state court

27    lawsuit, but failed to do so.  See Clark v. Yosemite Community College Dist., 785 F.2d 781, 786

28    (9th Cir.1986) ("A section 1983 claim may be brought in California state courts.").  Under

1    California's claim preclusion doctrine, "all claims based on the same cause of action must be

2    decided in a single suit; if not brought initially, they may not be raised at a later date." Mycogen

3    Corp. v. Monsanto Co., 28 Cal. 4th 888, 897 (2002). Accordingly, plaintiffs' claims in this action

4    concern the same "primary rights" that were at stake in their previous state court action.

5                        3.      Privity Between Parties

6          The court initially found that Dr. Dharawat failed to establish privity with the defendants

7    plaintiffs dismissed with prejudice in their prior state court action when Dr. Dharawat raised the

8    defense of claim preclusion in his motion to dismiss plaintiffs' original complaint because the

9    allegations of plaintiffs' initial pleading did not clearly establish that the conduct alleged against

10   Dr. Dharawat was the subject of plaintiffs' claims against SJGH in the prior action. (See ECF

11   No. 32 at 23-24.) Nevertheless, the allegations of the first amended complaint now demonstrate

12   that Dr. Dharawat is in privity with SJGH such that the plaintiffs' prior state court action against

13   SJGH precludes their claim against Dr. Dharawat in this case.

14         In particular, the allegations of plaintiffs' first amended complaint in this action reveal

15   that the actions plaintiffs attributed to SJGH in the prior action were those carried out by Dr.

16   Dharawat as an employee of that hospital. For instance, in their complaint in the state action,

17   plaintiffs alleged that "[o]n September 10, defendant San Joaquin General Hospital . . . conducted

18   an examination by transthoracic cardiogram . . . ." (ECF No. 45 at 21 ("State Complaint") ¶ 24.)

19   In their first amended complaint in this action, plaintiffs specifically identify Dr. Dharawat as the

20   employee who carried out that September 10, 2010 examination. (FAC at ¶ 47 ("On September

21   10, 2010, Defendant DHARAWAT performed a transthoracic cardiogram at San Joaquin General

22   Hospital . . . .").) Similarly, the state court complaint alleged that SJGH caused decedent's death

23   by failing to transfer him to a facility capable of performing valve replacement surgery despite

24   knowing that he required such an operation, while the amended complaint in the present action

25   ascribes this same knowledge and inaction to Dr. Dharawat. (State Complaint ¶¶ 65, 67-68; FAC

26   at ¶ 249.)

27   ////

28   ////

1       In essence, plaintiffs attempt to hold Dr. Dharawat liable for the same actions and

2   inactions for which they tried to hold SJGH derivatively liable as Dr. Dharawat's employer in

3   their prior state court action.  Accordingly, privity exists between Dr. Dharawat and SJGH for

4   purposes of this litigation as his interests were adequately represented by SJGH in the prior state

5   court action.  See Triano, 120 Cal. App. 345 (1932); Tabrizi v. JP Morgan Chase Bank, 2014 WL

6   1677826, at *4 (Cal. Ct. App. Apr. 29, 2014) (unpublished) (quoting Triano, 120 Cal. App. at

7   347) ("[R]es judicata arises when one party is in privity with another because the parties'

8   relationship is 'analogous to that of principal and agent.'"); Duffy v. City of Long Beach, 201

9   Cal. App. 3d 1352, 1359 (Cal. Ct. App. 1988) ("Since the prior judgment determined that the city,

10  which acts through its employees, had not violated any federal rights, the individual inspectors

11  were in a position to invoke the prior judgment.").

12      Based on the foregoing, the allegations of the first amended complaint and the judicially

13  noticed facts demonstrate that plaintiffs' claims against Dr. Dharawat are barred by the doctrine

14  of claim preclusion.  Accordingly, Dr. Dharawat's motion to dismiss should be granted and Dr.

15  Dharawat should be dismissed from this action with prejudice.

16  VI.   Conclusion

17      For the reasons discussed above, the court recommends that defendants' motions to

18  dismiss be granted and plaintiffs' Eighth Amendment claims against all defendants remaining in

19  this action be dismissed.  Furthermore, it is recommended that dismissal be with prejudice

20  because the allegations of the first amended complaint make it clear that plaintiffs could not cure

21  the defects in that pleading if granted further leave to amend.  Plaintiffs allege in their first

22  amended complaint that they "have submitted as Exhibits in this complaint every relevant

23  medical record from March 2010 through March 2013."  (FAC ¶ 104.)  As discussed above, these

24  attached records—on which plaintiffs' factual allegations and Eighth Amendment claims are

25  based—fail to plausibly demonstrate that State defendants, Vacavalley, or Dr. Bunuan acted with

26  deliberate indifference to the medical need decedent's aortic stenosis allegedly presented.  Taking

27  plaintiffs' allegation as true, these records document all of the care allegedly provided to decedent

28  by these defendants and show that they did not act with deliberate indifference.  Therefore,

1    further amendment to the complaint would be futile because plaintiffs would not be able to

2    provide in good faith additional factual allegations that could plausibly show that these

3    defendants acted with deliberate indifference.  See California Architectural Bldg. Prod. v.

4    Franciscan Ceramics, 818 F.2d 1466, 1472 (9th Cir. 1988) ("Valid reasons for denying leave to

5    amend include undue delay, bad faith, prejudice, and futility."); Noll v. Carlson, 809 F.2d 1446,

6    1448 (9th Cir. 1987).  In addition, plaintiffs' claim against Dr. Dharawat is barred under the

7    doctrine of claim preclusion.

8            Accordingly, IT IS HEREBY RECOMMENDED that:

9        1.      Defendants' motions to dismiss (ECF Nos. 45, 46, 48, 49) be granted;

10       2.      All defendants remaining in this action be dismissed with prejudice; and

11       3.      The Clerk of Court be directed to close this case and vacate all dates.

12           These findings and recommendations are submitted to the United States District Judge

13   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

14   days after being served with these findings and recommendations, any party may file written

15   objections with the court and serve a copy on all parties.  Such a document should be captioned

16   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17   shall be served on all parties and filed with the court within fourteen (14) days after service of the

18   objections.  The parties are advised that failure to file objections within the specified time may

19   waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th

20   Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

21           IT IS SO RECOMMENDED.

22   Dated:  May 27, 2016

23

24                                              KENDALL J. NEWMAN
                                                UNITED STATES MAGISTRATE JUDGE
25

26

27

28

                                                44